**No. 26-4045**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

MCLAUGHLIN CHIROPRACTIC ASSOCIATES, INC. ., et al.
individually and as representatives of
a class of similarly situated persons,

*Plaintiff-Appellant,*

v.

MCKESSON CORPORATION and
MCKESSON TECHNOLOGIES, INC.,

*Defendants-Appellees.*

*On Appeal from the United States District Court
for the Northern District of California
No. 4:13-cv-02219-HSG (Hon. Haywood S. Gilliam, Jr.)*

# APPELLANT'S OPENING BRIEF

Glenn L. Hara
Anderson + Wanca
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: 847-368-1500
ghara@andersonwanca.com

Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: 415-788-4220
Fax: 415-788-0161
wjonckheer@schubertlawfirm.com

*Attorneys for Plaintiff-Appellant*

## **Rule 26.1 Corporate Disclosure Statement**

Plaintiff-Appellant McLaughlin Chiropractic Associates, Inc. states that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: October 14, 2026

*/s/ Glenn L. Hara*
Glenn L. Hara
*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement

Table of Authorities ........................................................................................ i

Introduction ........................................................................................1

Jurisdictional Statement ........................................................................................1

Issues Presented ........................................................................................2

Statement of the Case ........................................................................................3

A. The faxes at issue and the earlier class-certification proceedings ........................................................................................3

B. The Amerifactors FCC proceeding and the prior Hobbs Act rulings ........................................................................................4

C. The FCC's earlier treatment of computerized and electronic fax services ........................................................................................6

D. Proceedings following Supreme Court remand ..............................7

1. The second renewed motion for class certification ...............7

2. The order denying class certification ................................. 10

Summary of Argument ........................................................................................ 11

Standard of Review ........................................................................................ 13

Argument ........................................................................................ 14

I. The district court erred in construing "telephone facsimile machine" to exclude the receiving equipment used by online fax services ................. 14

A. The statutory definition turns on the equipment's capacity, not whether the recipient uses a stand-alone machine or a commercial fax service ........................................................ 14

# TABLE OF CONTENTS

**Page(s)**

B. "Equipment" can include connected components; the statute does not require all functions to occur inside a single enclosure ........ 18

C. The different lists of sending and receiving devices do not exclude computers that satisfy the express definition of a telephone facsimile machine ........ 20

D. The transmission and expert evidence supplies a concrete application of the statutory definition........ 23

E. The district court's legislative-history analysis cannot replace the capacity-based definition with an automatic-printing requirement, and at a minimum, any ambiguity should be resolved in favor of the fax recipients the TCPA protects........ 26

II. The district court's treatment of the FCC rulings does not support its exclusion of online-fax recipients ........ 29

A. The 2003 Commission Order treated the commercial service's fax server as "equipment" satisfying the statutory definition and distinguished the service's subsequent email forwarding ........ 30

B. The WestFax Bureau Ruling treated the fax server, modem, and recipient's computer together as "equipment" satisfying the statutory definition ........ 32

C. The Amerifactors Bureau Ruling's reasoning should not displace the statutory text or the earlier agency analysis........ 36

D. The Amerifactors ruling cannot be applied retroactively to the 2009–2010 faxes ........ 40

E. The district court's reliance on "modern" technology fails to address the 2009–2010 class period........ 42

## TABLE OF CONTENTS

**Page(s)**

III. The erroneous exclusion of online-fax recipients is fatal to the denial of certification under Rule 23(b)(3) ........ 46

A. The common transmission records and technical evidence must be evaluated under the statutory capacity standard, not a categorical exclusion of online-fax recipients ........ 46

B. The district court's superiority conclusion rests on the same erroneous premise ........ 49

IV. Standing does not supply an alternative basis for affirming the denial ........ 51

A. Receipt through an online fax service does not categorically eliminate concrete injury ........ 51

B. Corporate status does not categorically eliminate the asserted intrusion and nuisance injury ........ 54

C. Any remaining standing inquiry must be assessed against the actual class-period record, not assumed from a service label ........ 58

V. The appropriate remedy is reversal and remand for certification proceedings under the correct legal standard ........ 61

Conclusion ........ 62

Certificate of Compliance

Certificate of Service

## TABLE OF AUTHORITIES

**CASES** **Pages(s)**

*Ambassador Animal Hosp., Ltd. v. Hill's Pet Nutrition, Inc.*,
2021 WL 3043422 (N.D. Ill. Feb. 17, 2021) .......................................... 36

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)........................................................................... 41

*Career Counseling, Inc. v. AmeriFactors Fin. Group*,
91 F.4th 202 (4th Cir. 2024)................................. 16–17, 19, 21–22, 26, 28

*Chennette v. Porch.com, Inc.*,
50 F.4th 1217 (9th Cir. 2022)........................................................... 56–57

*Daisy, Inc. v. Mobile Mini, Inc.*,
489 F. Supp. 3d 1287 (M.D. Fla. 2020)................................................. 58

*Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*,
343 F.R.D. 581 (E.D. Mo. 2023) ................................................ 15, 27, 31

*Drazen v. Pinto*,
74 F.4th 1336 (11th Cir. 2023)......................................................... 57–58

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011)........................................................................... 57

*Hall v. Smosh Dot Com, Inc.*,
72 F.4th 983 (9th Cir. 2023)................................................................ 53

*Holtzman v. Turza*,
728 F.3d 682 (7th Cir. 2013)...................................................... 47–48, 56

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) .................................................................. 13

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011)................................................................ 13

## TABLE OF AUTHORITIES

**CASES** **Pages(s)**

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014)........ 13

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013)........ 13, 45

*Lockwood v. Comm'r Soc. Sec. Admin.*,
616 F.3d 1068 (9th Cir. 2010)........ 40

*Lyngaas v. Curaden AG*,
992 F.3d 412 (6th Cir. 2021)........ 15, 17–20, 21, 23, 27–29, 41

*Marx v. General Revenue Corp.*,
568 U.S. 371 (2013)........ 22

*Maxum Indem. Co. v. Eclipse Mfg. Co.*,
2013 WL 5993389 (N.D. Ill. Nov. 12, 2013)........ 56

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025)........ 5, 29, 39, 61

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012)........ 15

*Mims v. Arrow Fin. Servs., LLC*,
565 U.S. 368 (2012)........ 1, 29

*Montgomery Ward & Co. v. FTC*,
691 F.2d 1322 (9th Cir. 1982)........ 41

*NLRB v. SW General, Inc.*,
137 S. Ct. 929 (2017)........ 22

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)........ 48, 60

## TABLE OF AUTHORITIES

**CASES** **Pages(s)**

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 27

*Panzarella v. Navient Solutions, Inc.*,
37 F.4th 867 (3d Cir. 2022) .......... 18–19

*Puffer v. Allstate Ins. Co.*,
675 F.3d 709 (7th Cir. 2012) .......... 13

*Salcedo v. Hanna*,
936 F.3d 1162 (11th Cir. 2019) .......... 58

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) .......... 13

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 40

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 54

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) .......... 14

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) .......... 52, 55–56, 60

*True Health Chiropractic Inc. v. McKesson Corp.*,
2016 WL 8925144 (N.D. Cal. Aug. 22, 2016) .......... 3

*True Health Chiropractic, Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) .......... 3–4

*True Health Chiropractic Inc. v. McKesson Corp.*,
332 F.R.D. 589 (N.D. Cal. 2019) .......... 4

## TABLE OF AUTHORITIES

**CASES** **Pages(s)**

*True Health Chiropractic, Inc. v. McKesson Corp.*,
2023 WL 7015279 (9th Cir. Oct. 25, 2023)............................................5

*Van Patten v. Vertical Fitness Group, LLC*,
847 F.3d 1037 (9th Cir. 2017)................................................... 14, 28, 52

*Wakefield v. ViSalus, Inc.*,
51 F.4th 1109 (9th Cir. 2022)......................................................... 52–53

**Statutes**

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

47 U.S.C. § 153(39) ........................................................................ 54–55

47 U.S.C. § 227 ................................................................................1

47 U.S.C. § 227(a)(1)........................................................................ 15

47 U.S.C. § 227(a)(3)...................................................................*passim*

47 U.S.C. § 227(b)(1)(C) ............................................................ 14, 20

47 U.S.C. § 227(b)(3)................................................................... 54, 56

**Rules & Regulations**

Fed. R. App. P. 4(a)(1)(A)...............................................................2

Fed. R. Civ. P. 23 ..................................................................... 12, 48, 60

Fed. R. Civ. P. 23(b)(3) ................................................................... 46

Fed. R. Civ. P. 23(f)..........................................................................3

*In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*,
17 FCC Rcd. 17459 (Sept. 18, 2002) ..................................................6

## TABLE OF AUTHORITIES

**Rules & Regulations** **Pages(s)**

*In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (FCC 2003)... 6, 9–11, 29–32, 33, 36–39, 43

*In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620 (CGAB Aug. 28, 2015)............ 7, 9–11, 29, 32–38, 43

*In re Amerifactors Fin. Group, LLC Petition for Expedited Declaratory Ruling*, 2019 WL 6712128 (CGAB Dec. 9, 2019)....................................... *passim*

**Other Authorities**

H.R. Rep. No. 102-317 (1991)......................................................................... 55

## INTRODUCTION

The district court in this case denied class certification based on the erroneous legal conclusion that faxes received through "online fax services" are categorically excluded from coverage under the Telephone Consumer Protection Act of 1991 ("TCPA"). Appellant McLaughlin Chiropractic Associates, Inc. ("McLaughlin") asks the Court to hold that the district court abused its discretion by basing its decision on that erroneous proposition, reverse the district court's denial of class certification, and remand for further proceedings under the correct legal standard. To the extent necessary, the Court should also reverse under de novo review the district court's entry of summary judgment against the "Online Fax Services Class" in 2021.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012).

This Court has jurisdiction under 28 U.S.C. § 1291. On May 22, 2026, the district court denied the Second Renewed Motion for Class Certification. ER-6. On July 1, 2026, the district court entered an order confirming that its prior rulings collectively disposed of the entire action as to all parties and that no claims or other

merits issues remained for adjudication. ER-5. The clerk entered a separate final judgment that same day. ER-3.

Appellant McLaughlin Chiropractic Associates, Inc. filed its original notice of appeal June 22, 2026. ER-155. Following entry of the final judgment, McLaughlin filed an amended notice of appeal on July 1, 2026, expressly designating the final-disposition order, the final judgment, the May 22, 2026 class-certification denial, and "any prior or related orders that merge into the final judgment or are otherwise reviewable on appeal." ER-153. The amended notice was filed on the same day as entry of final judgment and was therefore timely under Federal Rule of Appellate Procedure 4(a)(1)(A). McLaughlin seeks review of the denial of class certification and (to the extent necessary) the 2021 entry of summary judgment against the Online Fax Services Class in this appeal from the final judgment.

## ISSUES PRESENTED

1. Whether the district court abused its discretion in denying Plaintiffs' Second Renewed Motion for Class Certification on the ground that individualized issues predominate and class treatment is not superior because recipients who used "online fax services" are categorically excluded from TCPA coverage and cannot be separated from other recipients through a classwide mechanism.

2. Whether Defendants' alternative Article III standing arguments, which the district court did not reach, fail to provide an alternative ground for affirmance

of the denial of class certification because neither receipt through an online fax service nor business status eliminates the concrete injury caused by unsolicited fax advertisements.

3. Whether the summary judgment against the Online Fax Services Class can stand after the Supreme Court rejected mandatory adherence to the Amerifactors Bureau Ruling, where the TCPA does not categorically exclude faxes received through online fax services.

## STATEMENT OF THE CASE

### A. The faxes at issue and the earlier class-certification proceedings

McKesson sent the fax advertisements at issue between September 2, 2009, and May 11, 2010. ER-72. Plaintiffs True Health Chiropractic, Inc. and McLaughlin Chiropractic Associates, Inc. alleged that the advertisements were unsolicited and lacked the notice required by the TCPA. ER-130 ¶¶ 16–17.

Plaintiffs initially sought class certification, but the district court denied certification based on individualized questions concerning prior express invitation or permission. *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-HSG, 2016 WL 8925144 (N.D. Cal. Aug. 22, 2016). On Rule 23(f) review, this Court reversed in material part and held the predominance requirement was satisfied as to the recipients listed in Exhibit A to McKesson's interrogatory answers, excluding those also listed in Exhibits B or C. *True Health Chiropractic, Inc. v.*

*McKesson Corp.*, 896 F.3d 923, 927 (9th Cir. 2018). On remand, the district court certified an "Exhibit A" class in August 2019. *True Health Chiropractic Inc. v. McKesson Corp.*, 332 F.R.D. 589, 610 (N.D. Cal. 2019).

**B. The Amerifactors FCC proceeding and the prior Hobbs Act rulings**

In July 2017, while this case was on appeal from the district court's first denial of class certification, Amerifactors Financial Group, LLC petitioned the FCC for a declaratory ruling concerning "online fax services." ER-99. The petition described services that receive fax transmissions through a fax server or similar device, convert the documents or images into digital files, and allow subscribers to access the resulting files by logging into a server or by receiving a PDF attachment by email. ER-101–02.

In December 2019, the FCC's Consumer and Governmental Affairs Bureau granted the Amerifactors Petition. *In re Amerifactors Fin. Group, LLC Petition for Expedited Declaratory Ruling*, 2019 WL 6712128, ¶ 15 (CGAB Dec. 9, 2019) ("Amerifactors Bureau Ruling"). It concluded that an online fax service is not a "telephone facsimile machine" because the service effectively receives faxes sent as email over the Internet and is not itself equipment with the capacity to transcribe text or images from an electronic signal received over a regular telephone line onto paper. (*Id.* ¶ 3). The Bureau described the nature and operations of "current online fax services," concluded that a fax received by such a service as an electronic message

was effectively an email, and stated that an online fax service could not itself print a fax without the user connecting other equipment. (*Id.* ¶¶ 8, 11).

After the Amerifactors Bureau Ruling, McKesson moved to decertify the Exhibit-A Class. The district court concluded that then-governing circuit law required it to treat the Amerifactors ruling as binding. ER-7. The court modified the certified class into an Online Fax Services Class and a Stand-Alone Fax Machine Class, ER-7, entered summary judgment against the Online Fax Services Class, ER-44, and later decertified the Stand-Alone Fax Machine Class after finding that Plaintiffs had not established a workable classwide methodology for identifying the means by which class members received the faxes, ER-7.

The parties cross-appealed. This Court affirmed the denial of class certification on the basis that the Hobbs Act required the district court to treat the Amerifactors Bureau Ruling as binding. *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 22-15710, 2023 WL 7015279, at *2 (9th Cir. Oct. 25, 2023). The Supreme Court reversed. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025). It held that the Hobbs Act does not preclude a district court in a TCPA enforcement proceeding from independently assessing whether an agency's statutory interpretation is correct. *Id.* The Court did not decide whether the Bureau had correctly interpreted "telephone facsimile machine," leaving that issue for remand. *Id.*

### C. The FCC's earlier treatment of computerized and electronic fax services

The Amerifactors Bureau Ruling was not the first time the FCC considered whether faxes received by a service and then forwarded to the end-user electronically were covered by the TCPA. In 2002, the Federal Communications Commission issued a notice of proposed rulemaking, seeking comment concerning developing technologies, including computerized fax servers, in administering the TCPA. *In re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd. 17459 (Sept. 18, 2002). Commenters addressed services that received conventional fax transmissions through a server or other equipment, converted the transmission to an electronic file, and made the file available to the intended subscriber electronically. ER-93–94. They also argued that delivery as an email attachment fell outside the TCPA, that the receiving servers and computers were not "telephone facsimile machines," and that the service did not require automatic printing. ER-88–91; ER-93–94.

The Commission issued its ruling in 2003. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 199–202 (FCC 2003) ("2003 Commission Order"). The Order described "commercial facsimile services" that received fax transmissions through a fax server or similar equipment and made the resulting documents available to subscribers electronically. (*Id.* ¶ 199 & n.736). It concluded that faxes sent to personal

computers equipped with or attached to modems and to computerized fax servers were subject to the TCPA's unsolicited-fax prohibition, while distinguishing facsimile messages sent as email over the Internet. (*Id.* ¶ 200). The Commission explained that evolving technologies permitted fax messages to be sent and received in multiple ways. (*Id.* ¶ 199).

In September 2009, WestFax, Inc. filed a petition for clarification concerning electronic-fax services. ER-96. The Bureau described WestFax's FaxForward service as automatically converting received faxes into electronic images and delivered those images to an email inbox. *In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620, 2015 WL 5120880, at *1 ¶ 4 & n.15 (CGAB Aug. 28, 2015) ("WestFax Bureau Ruling"). The Consumer and Governmental Affairs Bureau resolved the petition in 2015, ruling that an e-fax—"a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment"—was covered by the TCPA. (*Id.* ¶ 9). It explained that the fax server, modem, and receiving computer together had the statutory capacity to transcribe the received signal onto paper. (*Id.*)

### D. Proceedings following Supreme Court remand.

#### 1. The second renewed motion for class certification.

On remand from the Supreme Court, Plaintiffs filed a Second Renewed Motion for Class Certification. ER-72. Plaintiffs asked the district court to certify

the class it previously certified in 2019, prior to the issuance of the Amerifactors Bureau Ruling. ER-73. Plaintiffs argued that the TCPA asks whether the relevant receiving "equipment" has the "capacity" specified in 47 U.S.C. § 227(a)(3), not whether the commercial service used by a recipient is itself a "telephone facsimile machine," as the Amerifactors ruling framed the issue. ER-75–78.

Plaintiffs offered the testimony of their expert, Robert Biggerstaff, who examined the fax-transmission records and explained the T.30 protocol by which sending and receiving equipment exchange information, transmit the document image, and confirm receipt. ER-111 ¶¶ 14–19; ER-113–15 ¶¶ 29–35. Biggerstaff explained that the sending system records a transmission as successful upon receiving a positive confirmation from the receiving equipment. ER-118–19 ¶¶ 43–47. Biggerstaff stated that this process applies whether the receiving equipment is a stand-alone fax machine or a computer with a fax modem. ER-118 ¶ 46.

Biggerstaff further reported that every device of which he was aware that could receive a T.30 fax transmission had the capacity to receive that transmission over a regular telephone line and print its contents. ER-119 ¶ 49. He explained that a successful-transmission record therefore documented receipt by equipment with those capabilities. ER-119 ¶ 50.

McKesson's expert was Kenneth Sponsler. With their Second Renewed Motion, Plaintiffs submitted transcripts of Sponsler's testimony in three other TCPA

fax cases. In that testimony, Sponsler acknowledged that a subscriber logged into an online fax service's portal to view a fax was not viewing an email but was instead using a computer to view the fax on the provider's server. ER-80, Sponsler Dep. 49:13–19. Sponsler also acknowledged that Internet access could permit access to a printer, while describing that capability as hypothetical or not useful and distinguishing it from a printing service actually offered by a provider. ER-83, Sponsler Dep. 26:13–28:6; ER-85, Sponsler Dep. 58:6–59:10.

Plaintiffs also addressed the FCC's three rulings and the underlying agency submissions. Plaintiffs explained that the 2003 Commission Order's "commercial facsimile services," the 2015 WestFax Bureau Ruling's "e-fax services," and the 2019 Amerifactors Bureau Ruling's "online fax services" described the same receiving technology. ER-60. Plaintiffs further explained that, even assuming that the 2019 ruling described a different and later technology than the earlier rulings, the faxes in this case were sent in 2009 and 2010, after the 2003 Order and during the period in which WestFax was petitioning the FCC regarding FaxForward. ER-60–61. Plaintiffs cited the WestFax petition's September 24, 2009 filing date and the description of FaxForward as a service that automatically converted received faxes into electronic images delivered to a subscriber's email inbox. ER-60–61.

McKesson opposed the motion. It maintained that the 2003 and 2015 rulings concerned earlier e-fax configurations, including a modem attached to a personal

computer, whereas the Amerifactors ruling addressed modern online fax services. ER-68–69. McKesson also argued that Plaintiffs had no classwide method to identify recipients who received faxes through online fax services rather than by stand-alone fax machine. ER-66–67.

### 2. The order denying class certification.

The district court held a hearing and denied class certification. ER-6. The order stated that the distinction between an "efax" and an "online fax service" was "somewhat unclear," noted that there might be "some other service in between" online fax services and stand-alone fax machines, and stated that the precise difference was not important. ER-7 & n.1. The order concluded that the parties did not appear to dispute the absence of a classwide method to separate recipients who used online fax services, traditional fax machines, or an intermediate service. *Id.*

In evaluating the agency rulings, the district court stated that the 2003 Commission Order and the 2015 WestFax Bureau Ruling covered faxes sent to computers with modems and computerized fax servers and to systems that converted conventional faxes into email attachments. ER-20. The court stated that it was "skeptical" that the three FCC decisions could "really . . . be reconciled," including because they reflected differing views about whether Congress was concerned with more generalized harms such as monitoring unwanted faxes. ER-22, n.14. The court found the Amerifactors ruling more persuasive, stating that it considered more

information about "modern" fax services, including cloud-based services, and more specifically addressed services beyond a single computer, modem, and printer configuration. ER-23. The order also stated that those technologies "may have existed at the time of the 2015 Ruling." *Id.*

The court concluded that an online fax service does not qualify as a "telephone facsimile machine." *Id.* Because the parties did not dispute that there was no classwide mechanism to disaggregate recipients who received the challenged faxes through online fax services, the court held that individualized issues predominated and that a class action was not superior. *Id.* The court did not reach McKesson's Article III standing arguments. *Id.*

## SUMMARY OF ARGUMENT

The district court denied certification on the basis that an "online fax service" is not a "telephone facsimile machine under the TPCA. That reasoning reflects the wrong statutory inquiry. The TCPA defines "telephone facsimile machine" by the "capacity" of the receiving "equipment," not the recipient's choice of service. Connected components may collectively possess the required capacity, and actual printing is unnecessary. A subscriber's subsequent electronic access does not negate an otherwise qualifying fax transmission.

The FCC's earlier rulings reinforce that reading. The 2003 Commission Order covered computerized fax servers, and the WestFax Bureau Ruling evaluated

connected receiving equipment together. The 2019 Amerifactors ruling does not persuasively answer those analyses. If the rulings address the same technology, the Amerifactors ruling represents an inadequately explained reversal. If they address materially different technologies, the district court still had to connect the asserted difference to the equipment receiving McKesson's faxes in 2009–2010. Its discussion of "modern" services did not resolve that class-period alternative.

The same error undermines both predominance and superiority. McLaughlin offered transmission records identifying confirmed receipt and expert testimony explaining the receiving equipment's statutory capacities. That common-proof theory requires evaluation under the correct standard, not rejection because recipients cannot be sorted by service labels. Correcting the coverage error removes the premise controlling the district court's analysis.

Article III standing supplies no alternative ground for affirmance. Statutory coverage and concrete injury remain distinct, but electronic receipt and corporate status do not themselves eliminate the asserted intrusion and nuisance. Congress expressly protected business recipients, and the historical-analogue inquiry concerns the character of the harm rather than an identical common-law cause of action. Any remaining injury questions must be evaluated against the actual class-period evidence and the requirements of Rule 23. This Court should reverse the denial of class certification and remand for certification proceedings under the correct legal

standards and, to the extent necessary, reverse or vacate the district court's entry of summary judgment against the Online Fax Services Class.

## STANDARD OF REVIEW

This Court reviews an order denying class certification for abuse of discretion. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). A district court abuses its discretion if "applie[s] an incorrect legal rule" or bases its application of the correct rule on a factual finding that is illogical, implausible, or unsupported by inferences drawn from the record. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014); *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012) (reviewing "purely legal determinations de novo"); *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 616 (8th Cir. 2011) (court "abuses its discretion if it commits an error of law"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (holding this standard "has teeth" because district court abuses its discretion if it "adopts an incorrect legal rule").

The Court first reviews the class-certification determination for legal error de novo; an error of law is a per se abuse of discretion. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018). If no legal error occurred, the Court reviews the decision for abuse of discretion and the underlying factual findings for clear error. *Id.* This Court accords a district court's denial of class certification noticeably less

deference than an order granting class certification. *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016).

The Court reviews the district court's entry of summary judgment against the Online Fax Services Class de novo. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1042 (9th Cir. 2017).

## ARGUMENT

### I. The district court erred in construing "telephone facsimile machine" to exclude the receiving equipment used by online fax services.

#### A. The statutory definition turns on the equipment's capacity, not whether the recipient uses a stand-alone machine or a commercial fax service.

The TCPA makes it generally unlawful "to send" an unsolicited advertisement to a "telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). The statute defines "telephone facsimile machine" as "equipment" with certain capacity: on the receiving side, the equipment must be capable of transcribing text or images from an electronic signal received over a regular telephone line onto paper. 47 U.S.C. § 227(a)(3). The key words are "equipment" and "capacity." When those terms are properly construed, the inquiry is whether the equipment to which the fax was sent has the specified technical ability—not whether the recipient uses a stand-alone fax machine or subscribes to a commercial fax service. *Id.*

There is no indication in the statutory definition that Congress meant to limit telephone facsimile machines to stand-alone fax machines. Congress could have

done that, but it did not. Instead, it chose a functional definition encompassing equipment with the specified capacity. The Sixth Circuit applied that definition in *Lyngaas v. Curaden AG*, 992 F.3d 412, 425–27 (6th Cir. 2021), rejecting an attempt to exclude recipients from a certified class merely because they received faxes on a computer rather than a traditional fax machine. The Sixth Circuit explained that the definition in § 227(a)(3) encompasses more than traditional fax machines and does not require actual printing of the advertisement. *Id.* Similarly, the district court in *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 (E.D. Mo. 2023), followed *Lyngaas* in certifying a TCPA fax class, rejecting the same argument.

Capacity is not the same as actual performance. This Court made that distinction in *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012), interpreting the neighboring definition of an automatic telephone dialing system in § 227(a)(1). The relevant inquiry was whether the equipment possessed the specified capacity, not whether it actually exercised that capacity in making the challenged calls. *Id.* The same distinction follows from § 227(a)(3). Equipment need only be able to perform the listed receiving and printing functions; the definition does not require that it actually print each fax received. Nor does it require that printing occur automatically, without a recipient's decision to print. A recipient's

choice to view, store, or delete an electronic image rather than print it does not, by itself, establish that the receiving equipment lacks printing capacity.

The statutory object of that inquiry is the receiving equipment, not the commercial service considered in the abstract. Calling a service "online" does not answer whether the equipment through which it receives a fax possesses the capacity Congress specified. Likewise, a service's practice of making a received fax available electronically does not itself resolve that equipment question. Plaintiffs' position does not eliminate the statutory requirements of receipt over a regular telephone line and capacity to transcribe onto paper. It requires that those requirements be applied to the relevant equipment rather than replaced with a categorical exclusion based on the subscriber's service label.

The fundamental error of the Fourth Circuit's contrary decision in *Career Counseling, Inc. v. AmeriFactors Fin. Group*, 91 F.4th 202 (4th Cir. 2024), is its selection of the service, rather than the relevant receiving equipment, as the unit of analysis. Although the court stated it was not treating the Amerifactors Bureau Ruling as binding, it accepted that ruling's description of online fax services and concluded that a service does not qualify because it neither receives signals over a regular telephone line nor can itself print faxes. *Id.* at 210. The court treated the user's need to connect other equipment to print as a reason for exclusion. *Id.* But whether a commercial service can itself print is not the statutory question. A service

operates through equipment; the question is whether the equipment to which the advertisement was sent has the specified receiving and printing capacity. Describing the service as "cloud-based," or describing the subscriber's access to a document as analogous to email, does not answer that question.

*Career Counseling* distinguished *Lyngaas* on the basis that the Sixth Circuit considered an efax transmitted over a telephone line, rather than an online fax received over the Internet. *Id.* at 210 n.5. That distinction makes the identity and operation of the receiving equipment critical; it does not justify substituting a service label for the statutory test. Whether the original fax transmission reaches equipment with the specified capacity must be assessed separately from the subscriber's subsequent electronic access to the document. Moreover, *Career Counseling* ignored that an online fax service also receives a fax over a telephone line; if it did not, there would be no logs of successful fax transmissions, which there are here. ER-111 ¶¶ 14–19; ER-115 ¶¶ 32–35; ER-118 ¶¶ 43–46; ER-119 ¶¶ 49–50; ER-123–24 ¶ 19.

The district court's exclusion of online-fax recipients therefore rests on the wrong threshold inquiry. The issue is not whether a commercial service is itself a telephone facsimile machine. It is whether the receiving equipment has the statutory capacity. That legal standard supplies the framework for examining both the equipment configuration and the transmission and expert evidence discussed below.

### B. "Equipment" can include connected components; the statute does not require all functions to occur inside a single enclosure.

Congress defined a telephone facsimile machine in terms of "equipment," not a single, self-contained device. 47 U.S.C. § 227(a)(3). Nothing in that definition requires the receiving and printing functions to occur within one enclosure. The relevant question is whether the equipment, considered together, has the specified capacity. Separating its components and asking whether each independently performs every statutory function adds a limitation Congress did not enact.

The Sixth Circuit rejected that approach in *Lyngaas*, 992 F.3d at 426–27. Its analysis did not treat a receiving computer as an isolated device. It considered the computer together with the connected modem and printer as equipment capable of receiving electronic signals over a telephone line and printing a fax. *Id.* A traditional stand-alone fax machine likewise comprises a modem, scanner, and printer; placing those components within one housing does not create a statutory distinction from equipment whose components are connected externally. *Id.* A computer can therefore be distinct from a telephone facsimile machine when considered alone and yet form part of one as an integrated piece of equipment. *Id.* at 427.

The Third Circuit's construction of the same word in the TCPA's autodialer definition reinforces that reading. In *Panzarella v. Navient Solutions, Inc.*, 37 F.4th 867, 872–74 (3d Cir. 2022), the court examined the ordinary meaning of "equipment" at the time of enactment and concluded that the term could encompass

several discrete objects serving a single purpose. It rejected a district court's decision to exclude a database server from the dialing equipment merely because the server resided on dedicated hardware and was developed separately from the other components. *Id.* The equipment had to be considered as a whole because the server and the other components operated together to conduct the dialing campaigns. *Id.* Although *Panzarella* concerned an automatic telephone dialing system, its ordinary-meaning analysis reinforces *Lyngaas*: Congress used "equipment" in both definitions, and § 227(a)(3) defines the "machine" by its equipment's capacity, not by a requirement that its components occupy one enclosure.

*Career Counseling* does not supply a persuasive answer to that connected-equipment analysis. The Fourth Circuit relied on the proposition that an online fax service cannot itself print and that its user must connect separate equipment to do so. 91 F.4th at 209–10. But the need for a connected component does not establish that the equipment, considered together, lacks the required capacity. *Lyngaas* assesses those components together; *Career Counseling* relies on the need for additional equipment without examining the connected components' collective capacity. Although the opinion does not expressly require a single enclosure, it leaves that equipment question unanswered. Even if the provider's server alone does not satisfy the definition, the inquiry remains whether the connected receiving equipment

collectively does. On that question, *Lyngaas* provides the more faithful analysis of Congress's choice of "equipment."

The district court's reasoning that equipment lacks the relevant capacity if it must be connected to other devices thus confuses a component with the equipment of which it forms a part. ER-15–17 & n.10. The statute does not require equipment to perform the listed functions in isolation. The broad definition of "telephone facsimile machine" permits those functions to be distributed among components operating together; it does not require each component independently to satisfy the entire definition.

This reading does not sweep every computer or Internet-connected device into the statute. The relevant components must constitute equipment with the specified capacity to transcribe text or images from an electronic signal received over a regular telephone line onto paper. Whether the equipment in this case possesses that capacity is addressed by the transmission and expert evidence discussed in Section I.D. But the statutory inquiry cannot be foreclosed merely because the functions are performed by connected components rather than housed within a single enclosure.

### C. The different lists of sending and receiving devices do not exclude computers that satisfy the express definition of a telephone facsimile machine.

Section 227(b)(1)(C) prohibits using a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone

facsimile machine. The different lists of sending and receiving devices do not exclude computers from the receiving side when they satisfy the definition in § 227(a)(3). The sending list permits the prohibition to reach advertisements originating from devices that need not themselves meet that definition. The receiving term, by contrast, requires equipment with the capacity Congress specified. That distinction gives effect to both lists without treating "computer" and "telephone facsimile machine" as mutually exclusive categories.

The Sixth Circuit addressed this precise argument in *Lyngaas*, 992 F.3d at 427, rejecting the inference that a computer's appearance only in the sending list excludes computers from the receiving definition. A computer is not excluded from § 227(a)(3), and a computer that is distinct from a telephone facsimile machine when considered alone can nevertheless form part of one as integrated equipment. *Id.* The statutory categories therefore overlap when the equipment possesses the specified capacity. Congress's express inclusion of computers among possible sending devices does not negate their potential inclusion within the defined receiving equipment.

*Career Counseling* draws the contrary inference from the different lists. 91 F.4th at 209–11. It reasons that the prohibition reaches faxes sent from a computer or other device, but not faxes sent to a computer or other device. That proposition is correct only if the receiving computer or device does not also satisfy the statutory definition of a telephone facsimile machine. The difference in the lists establishes

that receiving equipment must meet § 227(a)(3); it does not establish that computers are categorically incapable of doing so. Treating the different labels as mutually exclusive assumes the very conclusion that the definition requires the court to examine.

The *expressio unius est exclusio alterius* canon does not support a different result. Its force depends on context, and contrary indications can defeat an inference that mentioning one category excludes another. *Marx v. General Revenue Corp.*, 568 U.S. 371, 380 (2013). The canon applies only where the circumstances sensibly support an intended exclusion. *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017). Here, Congress's express definition supplies the contrary indication: "telephone facsimile machine" encompasses equipment with the specified capacity, without excluding equipment that includes a computer. There is no sensible inference that Congress simultaneously defined the receiving equipment by its capacity and excluded otherwise qualifying equipment merely because it includes a device separately named in the sending list. The inference drawn in *Career Counseling* cannot substitute mutually exclusive device labels for Congress's functional definition.

The omission of "computer" and "other device" from the receiving list thus has meaningful work to do under Plaintiffs' interpretation. It excludes receiving devices that lack the specified capacity, even though those devices may be used to

send an advertisement. It does not exclude equipment that meets the definition merely because that equipment includes a computer. *Lyngaas* supplies the better analysis because it reads the prohibition together with Congress's express definition rather than allowing an inference from the sending list to narrow that definition.

Plaintiffs therefore do not contend that every advertisement sent to any computer is covered. They contend that an advertisement sent to equipment satisfying § 227(a)(3) is covered, whether that equipment takes the form of a stand-alone fax machine or includes computers and connected components. The different sending and receiving lists preserve that capacity-based boundary; they do not create an additional exclusion for otherwise qualifying equipment used by online fax services.

### D. The transmission and expert evidence supplies a concrete application of the statutory definition.

The statutory inquiry is not answered by labeling a recipient's service "online." Plaintiffs offered evidence about the equipment receiving the transmissions and its technical capacity. Biggerstaff explained that the T.30 protocol requires positive confirmation from the receiving equipment before the sending system records a transmission as successful. ER-118–19 ¶¶ 43–47. A successful-transmission record reflects completion of the necessary phases of a fax transmission

to equipment with a fax modem and appropriate software, whether that equipment is a stand-alone fax machine or a computer with a fax modem. ER-118 ¶¶ 43–46.

Biggerstaff separately addressed printing capacity. He stated that every device of which he was aware capable of receiving a T.30 fax transmission also had the capacity to receive that transmission over a regular telephone line and print its contents. ER-119 ¶ 49. He explained why, in his opinion, the successful-transmission records therefore documented transmissions sent to and received by equipment with the receiving and printing capacities specified in § 227(a)(3). ER-119 ¶¶ 49–50. The inference rests on the transmission protocol together with his explanation of the equipment's capabilities—not merely on the presence of a telephone number or an Internet connection. Nor does it depend on whether the recipient chose to print a particular fax. Biggerstaff expressly distinguished completion of the T.30 transmission from what might subsequently happen to the contents of the received message. ER-118–19 ¶¶ 46–50.

Plaintiffs did not offer the experts' testimony to interpret the statute or decide the legal meaning of "telephone facsimile machine," as McKesson argued below. They offered it to establish, as a factual matter, the capabilities of the receiving equipment. The courts determine the statutory standard; technical evidence supplies the factual basis for applying it. McKesson's characterization of that evidence as an

irrelevant legal conclusion does not answer the explanation of the transmission process or the equipment's capacity.

Sponsler's testimony likewise demonstrates why the original transmission must be distinguished from the subscriber's subsequent access to the document. When asked about a fax traveling over a telephone line to an online fax service's server, performing the T.30 protocol, and being converted with a gateway to a PDF, he responded that the conversion could be to a PDF or another image. ER-82, Sponsler Dep. 22:24–23:12. That testimony concerns the receiving fax server and subsequent conversion, not an advertisement originating as an email.

Sponsler's "survey" into online fax providers does not establish that their equipment lacks printing capacity. In explaining his methodology, Sponsler testified that he presented himself as a prospective customer seeking a provider that would "print my fax and mail it to me or FedEx it to me." ER-82, Sponsler Dep. 25:9–17. The negative responses he received thus concerned the availability of a print-and-delivery service, not the technical capacity of the equipment used to receive the faxes. A provider's decision not to offer that service does not establish that its receiving equipment lacks the capacity to transcribe the fax onto paper. Nor does an inquiry confined to the provider's service offerings determine the capacity of connected provider-side and subscriber-side equipment.

*Career Counseling* also cannot substitute for examination of this evidence. Its exclusion rested in part on the erroneous premise that online fax services receive faxes over the Internet rather than over a regular telephone line. 91 F.4th at 209–11. But the subscriber's access to an image over the Internet does not establish how the original fax reached the provider's receiving equipment. The successful-transmission records and Biggerstaff's explanation of the T.30 protocol address that antecedent transmission. Whether that equipment has the specified capacity must be evaluated against the evidence, not assumed from the format in which the subscriber later views the document.

The evidence accordingly requires application of the equipment-and-capacity standard developed above. The failure of Sponsler's survey to test equipment capacity does not itself prove Plaintiffs' position; Biggerstaff's affirmative technical evidence supplies that basis. But neither a refusal to offer printing and physical delivery nor subsequent electronic access to a received fax supports categorical exclusion without addressing that affirmative evidence. The service label cannot do the work of the statutory inquiry.

### E. The district court's legislative-history analysis cannot replace the capacity-based definition with an automatic-printing requirement, and at a minimum, any ambiguity should be resolved in favor of the fax recipients the TCPA protects.

Congress defined a telephone facsimile machine by what its equipment has the capacity to do, not by whether receipt necessarily consumes ink and paper or

prevents another fax from arriving. 47 U.S.C. § 227(a)(3). The definition requires the specified receiving and printing capacity; it does not require automatic printing of every advertisement or exclusive occupation of a single receiving line. The district court's assessment of the harms associated with traditional fax machines cannot supply those additional limitations. ER-18–19. Legislative history may illuminate statutory language, but it cannot replace Congress's functional definition with a narrower description of the machines that prompted enactment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998) (holding statutory prohibitions may reach beyond the principal evil motivating enactment).

The Sixth Circuit recognized that distinction in *Lyngaas*, 992 F.3d at 426–27. Because the definition encompasses equipment possessing the specified capacity, it does not require actual printing of an advertisement. *Id.*; *see also Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 589 (E.D. Mo. 2023) (following *Lyngaas*). The court accordingly rejected the contention that Congress's concern with ink-and-paper costs limited coverage to traditional fax machines. *Lyngaas*, 992 F.3d at 427. Equipment does not cease to satisfy § 227(a)(3) merely because its user avoids those costs by choosing not to print an unwanted fax. Nor does greater receiving capacity remove otherwise qualifying equipment from the definition.

*Career Counseling* supplies no persuasive basis for importing those requirements. Although the Fourth Circuit grounded its conclusion in its reading of the statutory text, it invoked the House Report's discussion of shifted advertising costs and occupation of the recipient's machine as confirmation. 91 F.4th at 209–11. It reasoned that those problems do not exist with online fax services because recipients can choose whether to print and the services can receive multiple transmissions simultaneously. *Id.* But the ability to avoid printing addresses actual use, not printing capacity, and the ability to process multiple transmissions addresses equipment performance, not whether it meets Congress's definition. *Lyngaas* gives effect to the distinction between capacity and use; *Career Counseling*'s legislative-history discussion does not explain why avoiding a particular historical cost should exclude equipment that otherwise satisfies the enacted definition.

At a minimum, if the Court finds ambiguity after considering the text and structure, this Court's remedial-statute analysis favors the interpretation that protects fax recipients, not fax senders. In *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017), this Court explained, in addressing revocation of consent, that the TCPA is a remedial statute intended to protect consumers from unwanted automated calls and messages and should be construed consistently with that purpose.

The remedial-statute principle does not authorize disregarding the statutory capacity requirements, but it reinforces the interpretation grounded in those requirements: recipients remain protected when an unsolicited fax is sent to qualifying equipment, even if a commercial service subsequently makes the document available electronically. A categorical exclusion based on the recipient's ability to decline printing would make technological avoidance of one harm a reason to withdraw statutory protection, leaving those recipients without the TCPA's protection against unsolicited fax advertisements. That result conflicts with the statute's capacity-based definition and consumer-protection purpose. *See Lyngaas*, 992 F.3d at 427; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–73 (2012).

## II. The district court's treatment of the FCC rulings does not support its exclusion of online-fax recipients.

The Supreme Court's decision in this case directed the courts to give "appropriate respect" to the FCC's interpretations of the term "telephone facsimile machine." *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155 (2025). The FCC's earlier rulings addressed the very arrangement now described as an "online fax service": a conventional fax reaches the provider's receiving equipment, which converts the transmission into an electronic image that the subscriber accesses electronically. The 2003 Commission Order treated the provider's computerized fax server as covered "equipment" and distinguished the service's subsequent email forwarding. The 2015 WestFax Bureau Ruling

independently explained that the fax server, modem, and recipient's computer together constitute equipment possessing the statutory capacity. In 2019, the Bureau abruptly changed course in the Amerifactors Bureau Ruling, treating electronic access and subscriber-controlled printing as grounds for exclusion rather than applying those earlier equipment analyses.

The district court's reliance on supposedly different, modern technology does not resolve that conflict. If the rulings concern the same technology, the Amerifactors Bureau Ruling must be evaluated as a reversal of the earlier agency position, not as a more technologically informed application of it. If they concern materially different technologies, the relevant question is which equipment received McKesson's faxes in 2009–2010—not how the Bureau characterized current services in 2019.

### A. The 2003 Commission Order treated the commercial service's fax server as "equipment" satisfying the statutory definition and distinguished the service's subsequent email forwarding.

The Commission's 2003 consideration of computerized fax servers was not limited to a personal computer with a directly attached modem and printer. The proceeding expressly addressed commercial services that received faxes on behalf of subscribers and forwarded the resulting electronic images by email. *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 199–202 (FCC 2003) ("2003 Commission Order"). The receiving

fax server and the subscriber's later access to the image were separate steps in that arrangement. In short, the 2003 Commission Order "determined that online fax services were covered by the TCPA." *Brust*, 343 F.R.D. at 589.

The underlying submissions make that point concrete. Nextel described eFax.com and similar web-based providers as operating banks of fax servers that received clients' fax transmissions, converted them into electronic files, and delivered the files as email attachments. ER-93–94. It emphasized that the documents were not printed unless the subscriber affirmatively chose to print using a peripheral device. *Id.* Those are the features McKesson now invokes to distinguish online fax services from the technology considered in 2003. They were before the Commission then.

Against that background, the Commission concluded that the unsolicited-fax prohibition applies to faxes transmitted to personal computers and computerized fax servers, rather than only traditional stand-alone machines. (2003 Commission Order ¶¶ 200–201). Its analysis treats the provider-side fax server as the equipment receiving the original fax. The subscriber's subsequent receipt of an electronic copy does not undo that initial transmission to covered equipment.

The Order's exclusion of facsimile messages sent as email over the Internet does not contradict that holding. (*Id.* ¶ 200). Applied to the commercial-service arrangement described in paragraph 199 and footnote 736, it distinguishes the

service's later Internet forwarding from the original fax transmission to its receiving server. The forwarding service does not become liable merely by emailing its subscriber a document. But the advertiser does not escape the unsolicited-fax prohibition merely because the service forwards the document electronically after receiving it. Treating those two transmissions as interchangeable would erase the very fax-server coverage the Commission expressly recognized.

Nor did the Commission overlook subscriber-controlled printing. That feature was central to the industry's request for exclusion. The Commission nevertheless rejected a categorical distinction based on whether a fax arrived at a traditional machine, personal computer, or fax server. It also considered burdens beyond automatic consumption of paper and toner, including employee time spent monitoring unwanted faxes. (*Id.* ¶¶ 201–202). The district court could disagree with that reasoning after independently interpreting the statute, but it could not fairly characterize the Order as addressing only a simpler technology that lacked electronic delivery or optional printing.

**B. The WestFax Bureau Ruling treated the fax server, modem, and recipient's computer together as "equipment" satisfying the statutory definition.**

The WestFax Bureau Ruling independently confirms that the FCC's earlier treatment encompassed what the parties now call online fax services. WestFax sought clarification concerning FaxForward, a commercial service offered by

WestFax that automatically converted received faxes into electronic images delivered to a subscriber's email inbox. *In re WestFax, Inc. Petition for Consideration & Clarification*, 30 FCC Rcd. 8620, 2015 WL 5120880, at *1 ¶ 4 & n.15 (CGAB Aug. 28, 2015) ("WestFax Bureau Ruling"). The proceeding therefore concerned the same basic receiving arrangement at issue here: a conventional fax reaches provider-side equipment, and the provider makes the resulting image available electronically. It was not confined to a fax sent directly to a subscriber's personal computer with a locally attached modem.

The Bureau rejected the contention that conversion and electronic delivery placed that arrangement outside the TCPA. (WestFax Bureau Ruling ¶ 9). Applying § 227(a)(3), it explained that the relevant equipment encompasses the fax server and modem together with the computer receiving the electronic fax, because those components collectively possess the capacity to transcribe text or images from an electronic signal received over a telephone line onto paper. (*Id.*) The Bureau thus applied the definition to the receiving equipment as a whole, rather than requiring the commercial service or each component independently to perform every statutory function.

That analysis supplies an independent basis for coverage beyond the provider-server holding discussed in Section II.A. The 2003 Commission Order treats the provider's receiving fax server as covered equipment when the original

advertisement is transmitted to that server. WestFax additionally explains why the server, modem, and receiving computer may be assessed together. The two analyses are complementary, but distinct: even if the provider's server is not assessed alone, the inquiry does not end. The court must consider whether the connected receiving components collectively possess the capacity Congress specified.

The WestFax Bureau Ruling also maintained the distinction between the original fax transmission and subsequent email delivery. A document initially sent as email over the Internet is outside the unsolicited-fax prohibition; a document sent as a fax does not become exempt merely because the receiving service converts it into an email attachment. (WestFax Bureau Ruling ¶ 10). The subscriber's method of accessing the resulting image therefore cannot substitute for examining the equipment to which the advertiser sent the original fax. Otherwise, conversion after receipt would extinguish coverage that attached to the original transmission.

The Amerifactors Bureau Ruling's later characterization of the WestFax Bureau Ruling as involving a computer with an attached fax modem does not answer the earlier ruling's actual analysis. *In re Amerifactors Fin. Group, LLC Petition for Expedited Declaratory Ruling*, 2019 WL 6712128, ¶ 15 (CGAB Dec. 9, 2019) ("Amerifactors Bureau Ruling"). The WestFax ruling expressly included the fax server within the relevant equipment and considered the components together. (WestFax Bureau Ruling ¶ 9). Its discussion of FaxForward likewise demonstrates

that the Bureau understood the subscriber would receive an electronic image through an email inbox, rather than necessarily receive and automatically print a fax on a stand-alone machine. (*Id.* ¶ 4 & n.15). A description that omits those features cannot establish that the WestFax ruling concerned a categorically different technology.

The timing of the petition further defeats treating the WestFax ruling as an analysis of equipment unrelated to the class period. WestFax filed its petition on September 24, 2009, during the September 2, 2009–May 11, 2010 period in which McKesson sent the challenged faxes. ER-96. Although the Bureau issued its ruling in 2015, the service arrangement it addressed had been presented to the agency in 2009. As developed in Section II.E, that contemporaneous description matters even if the Amerifactors ruling is understood to concern materially different, later technology.

Thus, the WestFax Bureau Ruling supports coverage on two related grounds: the connected components collectively satisfy the statutory equipment definition, and later electronic delivery does not change the character of the original fax transmission. The district court's preference for the Amerifactors Bureau Ruling does not resolve either point. Before excluding recipients by service category, the court had to address the receiving equipment and its capacity—not merely the electronic form in which subscribers ultimately viewed the advertisements.

### C. The Amerifactors Bureau Ruling's reasoning should not displace the statutory text or the earlier agency analysis.

The Amerifactors Bureau Ruling "flies in the face" of the 2003 Commission Order and the 2015 WestFax Bureau Ruling. *Ambassador Animal Hosp., Ltd. v. Hill's Pet Nutrition, Inc.*, 2021 WL 3043422, at *1 (N.D. Ill. Feb. 17, 2021). It did not identify a new statutory definition or persuasively explain a change in the capacity of the relevant receiving equipment. Instead, the Bureau changed the level of analysis: where the 2003 Commission Order addressed receipt by a computerized fax server, and where the WestFax Bureau Ruling assessed the server, modem, and recipient's computer together, the Amerifactors Bureau Ruling asked whether an online fax service is itself a "telephone facsimile machine." (Amerifactors Bureau Ruling ¶¶ 8–13). That shift produced a contrary conclusion about the same basic arrangement without adequately answering the earlier equipment analyses.

The Amerifactors ruling's own description makes the continuity apparent. It describes an online fax service as a cloud-based service consisting of a fax server or similar device, with subscribers accessing digital documents through a server or an email attachment. (*Id.* ¶ 2). The commercial services before the Commission in 2003 likewise received fax transmissions through provider-side servers, converted them into electronic files, and delivered those files to subscribers by email. (2003 Commission Order ¶ 199 & n.736). The WestFax ruling addressed FaxForward's conversion of received faxes into electronic images delivered to an email inbox.

(WestFax Bureau Ruling ¶ 4 & n.15). Calling the arrangement "cloud-based" does nothing to establish that the receiving equipment lacks the capacity recognized in the earlier rulings.

The Amerifactors ruling's treatment of the document as effectively an email obscures the distinction the earlier rulings maintained. (Amerifactors Bureau Ruling ¶¶ 8, 11–12). A fax sent to a provider's receiving equipment is not the same transmission as the provider's subsequent electronic delivery to its subscriber. The 2003 Commission Order recognized coverage of computerized fax-server receipt while excluding messages sent as email over the Internet. (2003 Commission Order ¶¶ 199–202). The WestFax ruling likewise distinguished an original fax later converted to email from a document initially sent as email. (WestFax Bureau Ruling ¶ 10). The electronic form of the subscriber's copy does not answer whether the advertiser sent the original fax to equipment possessing the statutory capacity.

Nor does the Amerifactors ruling's assertion that a service cannot itself print without additional equipment answer the statutory question. (Amerifactors Bureau Ruling ¶ 13). A commercial service operates through equipment; it is not itself equipment. The relevant questions remain whether the provider-side server possesses the specified capacity or, alternatively, whether the connected receiving components possess that capacity collectively. The WestFax ruling expressly addressed the latter question by including the fax server and modem together with

the receiving computer. (WestFax Bureau Ruling ¶ 9). The need for connected equipment therefore is not a response to the WestFax ruling's reasoning. It is the circumstance that reasoning addressed.

The Amerifactors ruling attempted to distinguish the WestFax ruling as concerning a fax sent to a computer with an attached fax modem and the capacity to print. (Amerifactors Bureau Ruling ¶ 15). But that characterization omits both the commercial service described in the WestFax petition and the fax server expressly included in the Bureau's collective-equipment analysis. (WestFax Bureau Ruling ¶¶ 4, 9). It does not explain why a provider's conversion of an incoming fax into an email attachment defeated coverage in 2019 when that same feature was part of the service addressed in 2015.

Subscriber-controlled printing likewise was not a new technological development. Nextel's 2003 submissions emphasized that subscribers could view or discard fax attachments without printing and that printing required an affirmative choice and a peripheral device. ER-93–95. The Commission considered that arrangement and nevertheless treated computerized fax-server receipt as covered. (2003 Commission Order ¶¶ 199–200). The Amerifactors ruling's reliance on the absence of automatic paper-and-toner consumption therefore represents a change in interpretation, not an answer based on a previously unconsidered feature. (Amerifactors Bureau Ruling ¶¶ 13–14).

The reversal is particularly clear in the rulings' treatment of monitoring costs. The 2003 Commission Order recognized that employees must spend time distinguishing unwanted faxes from business communications. (2003 Commission Order ¶ 202). Amerifactors rejected reliance on generalized harms such as time spent monitoring unwanted faxes, while citing that very paragraph. (Amerifactors Bureau Ruling ¶ 14). That citation does not reconcile the Bureau's position with the Commission's; it merely points to the earlier analysis from which the Bureau departed.

The district court's conclusion that the Amerifactors ruling was more persuasive does not cure these defects. The court acknowledged difficulty reconciling the rulings but credited the Amerifactors ruling with considering more information about "modern," cloud-based services. ER-22–23. Yet the earlier proceedings already addressed commercial fax servers, email delivery, optional printing, and the need for peripheral equipment. The court did not identify what materially different receiving capacity justified the opposite conclusion. More information about a service's present-day operation is not, without that connection, a reason to discard the earlier equipment analysis.

The Supreme Court's direction to afford appropriate respect to the FCC's interpretation does not make the latest Bureau ruling controlling or presumptively superior. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146,

155 (2025). Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), the persuasive weight of an interpretation depends on its reasoning, thoroughness, and consistency with earlier and later pronouncements. An agency may change its interpretation, but a contrary conclusion does not automatically supply a persuasive justification. Here, the earlier rulings identify the receiving equipment and preserve the distinction between original fax receipt and later electronic access. The Amerifactors ruling does not adequately answer those analyses and instead relies on service-level classifications and actual printing practices that do not resolve statutory capacity. *See Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1073 (9th Cir. 2010) (applying *Skidmore* and declining to give substantial weight to later agency guidance inconsistent with the agency's other guidance).

The Court therefore should reject the Amerifactors Bureau Ruling's categorical exclusion rather than use it to displace the statute or the earlier agency reasoning. And if the Bureau's contrary conclusion is defended on the ground that it concerned materially different, later technology, that contention presents the separate class-period problem addressed in Section II.E, below: the challenged transmissions occurred in 2009–2010, not in the period described as "current" in the 2019 ruling.

### D. The Amerifactors ruling cannot be applied retroactively to the 2009–2010 faxes.

Even if the 2019 Amerifactors ruling otherwise supplied a permissible interpretation, its reversal of the FCC's earlier position should not govern the

transmissions in this case from a decade earlier. McLaughlin expressly raised this objection below. ER-125-26. The Supreme Court disfavors retroactive application of administrative rules and requires express congressional authorization for retroactive legislative rulemaking. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988).

The Sixth Circuit applied that principle to the Amerifactors ruling itself in *Lyngaas v. Curaden AG*, 992 F.3d 412, 427 (6th Cir. 2021). The Sixth Circuit concluded that the ruling had no bearing on class certification in a TCPA case like this one because the faxes at issue were sent prior to the Bureau ruling, citing *Bowen*. *Id.* The same temporal objection applies here: McKesson sent the challenged faxes in 2009–2010, long before the Bureau's 2019 ruling. As Sections II.A–C explain, the earlier FCC rulings already addressed fax-server receipt, electronic forwarding, and optional printing. The Amerifactors ruling changed that treatment rather than merely filling an interpretive gap.

Calling the Amerifactors ruling an adjudication does not make retroactivity automatic; this Court examines departures from established practice, reliance, the burden of retroactive application, and the statutory interest in applying the new rule. *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333–34 (9th Cir. 1982). As Sections II.A–C explain, the earlier FCC rulings had already addressed fax-server receipt and electronic delivery; the Bureau was not writing on a blank slate. Its

contrary treatment would extinguish claims arising from transmissions completed nearly a decade earlier. Even without a showing of actual reliance, that burden and departure weigh against retroactivity. And the TCPA's interest in protecting recipients from unsolicited fax advertisements favors preserving, rather than extinguishing, claims under the earlier interpretation. The label "clarification" does not substitute for that balancing. The following subsection separately addresses whether any asserted technological difference applied during the class period.

### E. The district court's reliance on "modern" technology fails to address the 2009–2010 class period.

Even if the Amerifactors ruling concerned materially different technology from that addressed in the earlier FCC rulings, that premise does not justify excluding recipients of McKesson's 2009–2010 faxes. The relevant inquiry concerns the equipment that received those transmissions during the class period, not services described as current in a 2019 ruling. If a technological difference explains the Bureau's contrary conclusion, the court must determine whether that difference applies to the receiving equipment involved here. Otherwise, the older technology remains subject to the earlier agency analysis discussed in Sections II.A and II.B.

Plaintiffs expressly preserved this alternative. In their reply, they first explained that the three rulings used different names for the same technology. They then argued that, even accepting McKesson's claim that the Amerifactors ruling addressed different technology, the proposed class covers faxes sent between

September 2, 2009, and May 11, 2010—after the 2003 Commission Order and during the period in which WestFax sought clarification concerning its FaxForward service. ER-60–61. Plaintiffs thus presented two independent responses: either the Amerifactors ruling reversed the earlier treatment of the same technology, or its treatment of later technology did not establish exclusion of the equipment used during the class period. (*Id.*)

The WestFax proceeding makes the temporal connection concrete. WestFax filed its petition on September 24, 2009, three weeks after the first challenged transmissions in this case. ER-96. The petition concerned FaxForward, which converted received faxes into electronic images delivered to a subscriber's email inbox. Although the Bureau resolved the petition in 2015, the service configuration it considered had been presented to the agency during the class period. The date of the ruling therefore cannot be used to detach its equipment analysis from the technology described in the contemporaneous petition.

The district court did not resolve that alternative. In preferring the Amerifactors ruling, it reasoned that the Bureau had apparently considered more information about "modern," cloud-based services and more specifically addressed configurations beyond a single computer, modem, and printer. The court added that those technologies "may have existed at the time of the 2015 Ruling." ER-23. But possible existence in 2015 does not establish use during the 2009–2010 class period.

Nor does information about services operating in 2019 identify the capacity of the equipment that received McKesson's faxes roughly a decade earlier.

The district court's statement that the precise difference between an efax and an online fax service was "not important" likewise did not answer Plaintiffs' argument. ER-7, n.1. The court reasoned that the parties did not appear to dispute that services within the Amerifactors ruling's cloud-based description were at issue and that no classwide method separated recipients among service categories. *Id.* But that general description—provider-side fax equipment followed by electronic access—also describes the services considered in the earlier proceedings. A service's inclusion within that description does not establish the materially different receiving architecture on which the court relied to prefer the 2019 ruling.

The distinction cannot be simultaneously immaterial when describing the recipients yet decisive when choosing among the agency rulings. If a technological change accounts for the Amerifactors ruling's contrary conclusion, its nature and its connection to the class-period equipment matter. If no material change separates the arrangements, the same-technology argument remains: the Bureau reversed the earlier treatment of fax-server receipt and connected equipment without persuasively answering those analyses.

Plaintiffs' alternative is not a categorical objection to applying a later statutory interpretation to earlier conduct. It concerns the factual fit of a technology-specific

interpretation. The calendar alone does not establish that a particular configuration was unavailable in 2009–2010. Equally, a description of current technology in 2019 does not establish that materially different equipment received the challenged faxes. To rely on technological change as a reason to distinguish the earlier rulings, the district court would have had to identify that change and connect it to the class-period transmissions. It failed to explain how its characterization of modern services supplied that connection.

That omission matters because the denial of certification rested on a categorical exclusion of online-fax recipients. The absence of a classwide method to separate service categories becomes dispositive only if those categories correspond to a legally relevant difference in receiving equipment. It does not itself establish that difference. Plaintiffs' equipment and transmission evidence must be evaluated under the statutory capacity test, rather than displaced by a later service label.

Accordingly, even if the Court accepts the premise that the Amerifactors ruling concerned materially different technology, the district court's analysis does not establish that the class-period equipment falls within that exclusion. Its failure to do so leaves the asserted technological basis for excluding online-fax recipients—and for denying certification—unresolved. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 515–16 (9th Cir. 2013) (reversing as abuse of discretion certification denial based on implausible reasoning and conclusions unsupported by the record).

## III. The erroneous exclusion of online-fax recipients is fatal to the denial of certification under Rule 23(b)(3).

### A. The common transmission records and technical evidence must be evaluated under the statutory capacity standard, not a categorical exclusion of online-fax recipients.

The district court denied certification based on its conclusion that online fax services did not qualify as telephone facsimile machines and no classwide mechanism separated recipients who used those services from other recipients. ER-23. The absence of a sorting mechanism became dispositive only because the court first placed one category of recipients outside the statute. Rejecting that categorical exclusion requires the court to address a different question: whether the common transmission records and technical evidence establish receipt by equipment possessing the statutory capacity.

Plaintiffs supplied evidence directed to that question. Biggerstaff examined McKesson's fax-broadcast records, which identified transmission dates, destination fax numbers, and results, including pages confirmed received. He explained that those records were consistent with data automatically recorded by computer-based fax-broadcasting platforms. ER-111 ¶¶ 14–19. His analysis also matched transmission records to the fax numbers in McKesson's interrogatory exhibits, identifying numbers with confirmed transmissions that appeared only in Exhibit A and not in Exhibits B or C. ER-112–13 ¶¶ 20–26. Thus, the proposed proof is not

confined to a general description of fax technology; it connects the transmission data to the recipient grouping at issue.

Biggerstaff then explained the technical significance of a successful-transmission entry. Under the T.30 protocol, the receiving equipment must positively confirm receipt before the sending system records success. In his experience, such an entry reflects completion of the necessary transmission phases to a device with a fax modem and appropriate software, whether the receiving device is a stand-alone machine or a computer with a fax modem. ER-118 ¶¶ 43–46. Separately, he stated that every device of which he was aware capable of receiving a T.30 transmission also possessed the capacity to receive it over a regular telephone line and print its contents. ER-119 ¶ 49. He consequently opined that a successful-transmission record documented receipt by equipment possessing the capacities specified in the statute. ER-119 ¶¶ 49–50.

Those two parts of the proof perform different work. The records identify the transmissions confirmed received; the technical opinions explain why those confirmations, in Biggerstaff's view, establish receipt by qualifying "equipment." If credited under the correct statutory interpretation, that evidence permits the capacity question to be answered through a common method rather than testimony from each recipient about its service provider or decision to print. *See Holtzman v. Turza*, 728 F.3d 682, 684–85 (7th Cir. 2013) (rejecting need for recipient-by-recipient

adjudication where fax-broadcast logs identified successful transmissions through confirmation codes returned by the receiving equipment). That reasoning supports using McKesson's transmission records as common proof of receipt here; Biggerstaff's separate equipment-capacity opinion supplies the additional basis for determining whether the receiving equipment satisfied § 227(a)(3).

The inference does not rest merely on possession of a fax number, and successful receipt is not treated as independently proving printing capacity. The latter proposition rests on Biggerstaff's separate equipment-capacity opinion, whose factual basis must be evaluated as explained in Section I.D.

McLaughlin does not contend that correcting the statutory interpretation automatically establishes predominance or conclusively resolves every factual dispute. Plaintiffs must establish Rule 23's prerequisites by a preponderance of the evidence, and the district court must rigorously assess the proposed common proof, resolving expert disputes as necessary to determine whether the relevant question can be answered classwide. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665–67 (9th Cir. 2022) (en banc). Here, that requires assessing whether the transmission records and Biggerstaff's equipment-capacity opinion support the proposed inference and whether contrary evidence reveals material differences requiring individualized proof. But the inability to identify which subscribers used online fax services does not answer either question. Under

the equipment-and-capacity standard, a service category matters only if it corresponds to a difference affecting statutory coverage. Subsequent electronic access or a decision not to print does not, without more, establish such a difference.

Nor did Plaintiffs' acknowledgment that no classwide mechanism separated the service categories concede that separation was legally necessary. Their evidence sought to establish the relevant capacities without that sorting. The district court's categorical exclusion of online-fax-service users bypassed that evidentiary theory. The resulting predominance determination therefore cannot stand without reconsideration under the correct definition.

Any asserted difference in receiving configurations must also be connected to the equipment used during the 2009–2010 class period, as Section II.E explains. The proper inquiry is whether the common records and technical evidence establish qualifying receipt for the proposed class, and whether any actual differences defeat that common method—not whether recipients can be sorted by labels that do not themselves determine capacity. The district court's stated statutory-coverage rationale requires reversal and reconsideration of predominance on the proper basis.

**B. The district court's superiority conclusion rests on the same erroneous premise.**

The district court's superiority conclusion does not supply an independent basis for denying certification. In the same sentence announcing its predominance ruling, the court concluded that class treatment was not superior because online fax

services fell outside the statutory definition and no classwide mechanism separated recipients who used those services. ER-23. The asserted obstacle to class treatment was therefore the same technological classification underlying its predominance ruling, not a separate reason why individual adjudication would better resolve the claims.

Correcting the coverage ruling removes that asserted obstacle. If a fax sent to qualifying receiving equipment remains covered when the subscriber accesses the resulting image electronically, the district court need not separate recipients merely to exclude those who used a commercial service. An inability to perform that legally unnecessary sorting cannot establish that the class is unmanageable or that another method of adjudication is superior.

Individual litigation would not cure the asserted difficulty in any event. Whether the relevant receiving equipment satisfies the statutory capacity requirement would remain a question in each action. To the extent that question can be answered through common transmission and equipment evidence, requiring separate proceedings would repeat the inquiry rather than resolve an obstacle peculiar to class treatment. The district court's categorical exclusion obscured that comparison by making service-category identification a threshold requirement for every claim.

Plaintiffs do not contend that correcting the statutory interpretation automatically establishes superiority or eliminates every possible management issue. Their point is narrower: the court must assess the available methods of adjudication under the correct coverage standard. Any genuine difficulty must arise from a legally relevant question supported by the class-period record, not simply from uncertainty about whether a subscriber viewed the fax on paper, by email, or through a portal.

The district court's stated superiority rationale thus rises or falls with its exclusion of online-fax recipients. Because that exclusion rests on the errors identified in Sections I and II, the resulting superiority conclusion cannot sustain the denial of certification independently. Superiority must be reconsidered without treating separation by fax-service category as necessary merely because some recipients accessed their faxes electronically.

## IV. Standing does not supply an alternative basis for affirming the denial.

### A. Receipt through an online fax service does not categorically eliminate concrete injury.

The district court expressly declined to reach Defendants' standing arguments. ER-23. Those arguments nevertheless warrant consideration because McKesson asserted them as a separate reason to deny certification. Plaintiffs answered them in their reply, explaining that the intrusion and nuisance of an unsolicited fax advertisement do not disappear merely because the recipient uses an online fax service. ER-62–65.

The Supreme Court requires concrete harm even where Congress has supplied a cause of action, but an injury need not be physical or monetary: an intangible injury may qualify when it bears a close relationship to a traditionally recognized harm, including intrusion upon seclusion. The historical inquiry requires an analogue, not an exact duplicate. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204–05 (2021). The relevant question therefore is whether the unsolicited communication causes a cognizable intrusion or nuisance—not whether it consumes paper and toner.

In *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017), this Court recognized the historical relationship between unwanted telemarketing and invasion of privacy, intrusion upon seclusion, and nuisance. It also explained that Congress sought to protect against unwanted telemarketing calls and fax advertisements. Its holding concerning text messages rested on the substantive harm of unsolicited contact, not an economic charge or depletion of physical resources. *Id.* That reasoning supports recognizing the same kind of harm when an unsolicited fax advertisement reaches the recipient electronically.

Nor did *TransUnion* displace that analysis. In *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117–18 (9th Cir. 2022), the Court expressly rejected that contention. Applying both Congress's judgment and the historical-analogue inquiry, the Court held that receipt of unsolicited calls caused concrete injury because the harm closely

resembled traditional privacy, seclusion, and nuisance harms. *Id.* Thus, the absence of a tangible resource loss does not answer the constitutional question.

McKesson argued below that electronic receipt produces concrete injury only if a recipient's device settings generate an alert, and that reviewing a fax through a portal is a voluntary choice rather than an injury attributable to the sender. ER-70–71. But the alert is a possible manifestation of the intrusion, not its necessary definition. Making standing depend on whether a device emitted a sound or displayed a notification would substitute the recipient's interface settings for the character of the unwanted contact.

*Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 988–90 (9th Cir. 2023), reinforces that distinction. There, the Court held that an owner and subscriber whose number was on the Do-Not-Call Registry suffered concrete injury when unsolicited texts were sent to that number, even though her son used the phone. The Court did not require her to establish that she personally experienced an alert or contemporaneously read the messages; her additional allegations of irritation were unnecessary to establish injury. *Hall* concerned text messages, not fax advertisements, but its reasoning refutes treating a personally perceived notification as an indispensable component of TCPA injury.

The same distinction answers the suggestion that electronic delivery makes the asserted injury self-inflicted. Plaintiffs' theory concerns the sender's unsolicited

intrusion into the recipient's fax communications. The recipient's ability to delete, store, or decline to open the fax may reduce its practical burden, but it does not establish that the unwanted communication never arrived. Nor does subsequent email forwarding transform the underlying fax transmission into an ordinary marketing email for purposes of the injury analysis.

### B. Corporate status does not categorically eliminate the asserted intrusion and nuisance injury.

McKesson argued below that business entities receiving faxes through online services cannot establish concrete injury because corporations lack a common-law right to personal privacy. ER-71. That argument substitutes the historical identity of eligible tort plaintiffs for the required examination of the asserted harm. An unsolicited intrusion into a business's fax communications is a concrete harm, and the absence of an identical common-law cause of action does not make that harm constitutionally nonexistent.

In assessing whether an intangible harm is concrete, courts consider both its close relationship to a harm traditionally recognized as a basis for suit and Congress's judgment in identifying injuries warranting legal protection. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016). Here, Congress's judgment expressly encompasses corporate recipients.

The TCPA authorizes a "person or entity" to seek relief for violations of its unsolicited-fax prohibition, 47 U.S.C. § 227(b)(3), and the Communications Act

defines "person" to include a corporation, *id.* § 153(39). Congress therefore chose to protect businesses as well as natural persons against unsolicited fax advertising. That choice bears directly on whether the asserted intrusion into a business's fax communications constitutes concrete injury. It must be considered together with the historical analogue, rather than discounted merely because corporations could not maintain an identical common-law personal-privacy claim.

In addition, Congress was concerned not only with the "paper and ink" and "tied up" fax lines, but was also concerned with the "interference, interruptions, and expense" resulting from junk faxes to businesses in particular. H.R. Rep. No. 102-317 at 25 (1991). The House Report on the TCPA stated that, "[s]ince businesses have begun to express concern about the interference, interruptions and expense that junk fax[es] have placed upon them, states are taking action to eliminate these telemarketing practices," thus motivating Congress to take action. *Id.*

That choice identifies businesses as intended beneficiaries of the prohibition, not incidental recipients whose communications Congress left unprotected. Statutory eligibility does not establish injury by itself. But neither can the injury analysis begin and end with the proposition that corporations could not maintain a common-law tort protecting an individual's personal privacy. The question is whether the harm to the business's own communications interest bears the requisite relationship to a traditionally recognized harm, keeping in mind that Congress may

make concrete, de facto injuries actionable even when they were previously inadequate in law. *TransUnion*, 141 S. Ct. at 2204–05.

Courts addressing TCPA insurance coverage have recognized the distinction between common-law personal privacy and the seclusion interest the statute protects. For example, in *Maxum Indem. Co. v. Eclipse Mfg. Co.*, No. 06 C 4946, 2013 WL 5993389, at *7 (N.D. Ill. Nov. 12, 2013), the court considered the argument that corporations lack personal-privacy rights and concluded that the TCPA's protection against unwanted fax intrusion extends to corporations as well as individuals. In *Holtzman v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013), a TCPA action brought by a corporate accounting business, the Seventh Circuit recognized that receiving and deleting a fax electronically can impose a loss of time on a business plaintiff even without printing or monetary loss. Although these decisions predate *TransUnion*, they support recognizing a practical burden on business communications rather than treating electronic receipt as inherently harmless.

This Court's decision in *Chennette* supplies additional support. The Court there held that § 227(b)(3)'s reference to an entity includes a business and separately held that unsolicited automated texts caused sufficiently concrete and particularized injury notwithstanding the recipients' solicitation of business inquiries. *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1222–23 (9th Cir. 2022). The plaintiffs were

individual contractors, but the decision forecloses treating business use of communications as inherently incompatible with the harm of unsolicited contact.

McKesson's reliance on *FCC v. AT&T Inc.* does not establish otherwise. The Supreme Court there construed "personal privacy" in a FOIA exemption, holding the phrase did not extend to corporations. *FCC v. AT&T Inc.*, 562 U.S. 397, 406–09 (2011). The Court discussed the common-law limits on corporate personal-privacy claims, but expressly distinguished its statutory inquiry from the broader scope of corporate privacy interests under constitutional or common law. *Id.* at 406–07. The TCPA, in contrast, expressly protects entities against unsolicited fax advertisements, and the Article III inquiry asks whether the business's asserted injury bears a close relationship to a traditional harm. A decision about the meaning of "personal privacy" in a disclosure exemption does not decide whether that intrusion is concrete under a different statute.

The Eleventh Circuit's en banc decision in *Drazen* reinforces the distinction between a historical analogue and an identical tort claim. It held that receipt of a single unwanted text message causes concrete injury because the harm is similar in kind to intrusion upon seclusion, even though its degree of offensiveness would not support the common-law action. *Drazen v. Pinto*, 74 F.4th 1336, 1342–45 (11th Cir. 2023) (en banc). *Drazen*'s methodology requires examination of the asserted harm rather than mechanical duplication of every common-law limitation. McLaughlin's

argument is that the unwanted intrusion remains present when its recipient is a business whose communications Congress expressly protected; corporate status does not make that intrusion entirely absent.

That development is especially important to McKesson's reliance on *Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp. 3d 1287, 1293–94 (M.D. Fla. 2020). The district court there concluded that a corporate online-fax recipient could not invoke invasion of privacy as an analogue because corporations were not eligible plaintiffs for that tort at common law. But that reasoning rested substantially on the rejection of concrete injury from a single unwanted text in *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019). It applied that rule to an employee's time reviewing and deleting an electronically delivered junk fax, reasoning that the two communications did not differ qualitatively in harm. *Daisy*, 489 F. Supp. 3d at 1292. But *Drazen* subsequently reached the opposite conclusion about the text-message comparator: a single unwanted text causes concrete injury. 74 F.4th at 1345. The en banc court thus overruled *Salcedo* sub silentio on the single-text concrete-injury question. Its holding cannot be reconciled with the rule on which *Daisy* relied.

### C. Any remaining standing inquiry must be assessed against the actual class-period record, not assumed from a service label.

Even if the Court concludes that particular receiving configurations could present different injury questions, that possibility does not establish that individualized standing inquiries defeat certification here. Because the district court

declined to reach Defendants' standing arguments, its order contains no determination of which class-period recipients lacked concrete injury, how many such recipients there were, or whether any legally relevant differences required individualized proof. McKesson's alternative theory must be evaluated against the evidence, not treated as an automatic consequence of the label "online fax service."

The intrusion and nuisance caused by the challenged unsolicited communications are cognizable harms, and electronic access and business status do not categorically negate them. The relevant inquiry is whether the common evidence establishes that injury for the recipients whose claims Plaintiffs seek to litigate—not whether they can be sorted into commercial service categories that do not themselves answer the injury question. Here, receipt can be established through McKesson's fax-broadcast records rather than recipient-by-recipient testimony. McKesson cannot create a need for individualized testimony about alerts or device settings merely by insisting on an additional injury condition that the governing analysis does not require.

The alternative argument is also temporally specific. The proposed class concerns transmissions from September 2009 through May 2010. Even if the services described in the 2019 Amerifactors ruling present different injury questions, there is no basis to conclude that the supposedly different technology was used by recipients during that earlier period.

The constitutional and certification inquiries must likewise remain distinct. The Supreme Court requires each class member to possess Article III standing to recover individual damages, while expressly reserving whether every member must demonstrate standing before certification. *TransUnion*, 141 S. Ct. at 2208 & n.4. This Court, sitting en banc, rejected a categorical Rule 23 prohibition on certifying a class potentially containing more than a de minimis number of uninjured members. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668–69 (9th Cir. 2022) (en banc). The inquiry instead requires rigorous analysis of whether common questions predominate over individualized questions, including questions of injury and entitlement to damages. *Id.* That rule neither authorizes recovery by uninjured members nor excuses examination of evidence showing material individual differences.

Accordingly, a remaining standing issue would require identification of the legally relevant difference in injury, examination of the class-period evidence supporting it, and assessment of whether resolving that difference would overwhelm common questions. The district court made no such determination because it denied certification on statutory-coverage grounds and did not reach standing. ER-23. Its coverage ruling cannot be preserved by substituting an unexamined assumption that online-fax recipients lacked injury or that their injury necessarily demands individualized proof.

If the Court leaves any such evidentiary questions unresolved, they should be considered on remand under the correct legal standards and against the actual record. Standing supplies no categorical alternative ground for affirmance based merely on electronic access, business status, or the absence of a method for separating recipients by service label.

**V. The appropriate remedy is reversal and remand for certification proceedings under the correct legal standard.**

This Court should reverse the denial of Plaintiffs' Second Renewed Motion for Class Certification and remand for further certification proceedings under the correct interpretation of "telephone facsimile machine." The district court's stated predominance and superiority conclusions both followed from its categorical exclusion of online-fax recipients and the absence of a classwide mechanism to separate them. ER-23. As argued above, that classification problem cannot sustain the denial once the erroneous coverage premise is removed.

The Court should also reverse or vacate the 2021 summary judgment against the Online Fax Services Class, to the extent that judgment remains operative. The district court entered that judgment because it treated the Amerifactors Bureau Ruling as binding and concluded that the class had no TCPA cause of action as a matter of law. ER-44. The Supreme Court rejected mandatory adherence to that ruling but left its substantive correctness for remand. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 169 (2025). If this Court agrees that

the TCPA does not categorically exclude faxes received through online fax services, the legal premise for the adverse merits judgment disappears.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order denying Plaintiffs' Second Renewed Motion for Class Certification and, to the extent necessary, the summary judgment against the Online Fax Services Class, and remand for further proceedings.

Respectfully submitted,

By: */s/ Glenn L. Hara*

Glenn L. Hara
**ANDERSON + WANCA**
3701 Algonquin Rd., Suite 500
Rolling Meadows, Illinois 60008
Tel: (847) 368-1500
Fax: (847) 368-1501
Email: ghara@andersonwanca.com

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,589 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word (version 10) in Times New Roman type style, font size 14 pt.

Dated: October 14, 2026

/s/ Glenn L. Hara

*Attorney for Plaintiff-Appellant*
*McLaughlin Chiropractic Associates, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2026, I electronically filed the foregoing Plaintiff-Appellant Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will send a notice of electronic filing to counsel of record registered with that system.

/s/ Glenn L. Hara

Dated: October 14, 2026